CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JAN 31 2022

JULIA C. DUDLEY, CLERK
BY:  s/ H. MCDONALD
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| PATINA W.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 4:20-cv-00060 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI | ) | By:   Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Patina W., proceeding pro se, asks this Court to review the Commissioner of

Social Security's final decision denying her application for disability insurance benefits ("DIB")

under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before

me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the

parties' filings, and the applicable law, I cannot find that substantial evidence supports the

Commissioner's denial of benefits. Accordingly, I respectfully recommend that the presiding

District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C.

§ 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. 42 U.S.C. §
405(g); Fed. R. Civ. P. 25(d).

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*,

88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100

(1991)).

 "Substantial evidence" means "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is

"more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount

of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes

into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera

Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir.

1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence

allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434

F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not

binding if it was reached by means of an improper standard or misapplication of the law."

*Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

 A person is "disabled" within the meaning of the Act if he or she is unable to engage in

"any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20

C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Patina applied for DIB in July 2018, alleging disability because of partial blindness, demyelinating changes in the brain, neuropathy, gait apraxia, vertigo, chronic obstructive pulmonary disease ("COPD"), pontine lesion, primary hypertension, type 2 diabetes mellitus, and fibromyalgia. Administrative Record ("R.") 167–69, 185, ECF No. 12. She alleged that she became disabled on April 25, 2018. R. 168. Disability Determination Services ("DDS"), the state agency, denied her claim initially in December 2018, R. 81–93, and upon reconsideration in May 2019, R. 94–111. In August 2019, Patina appeared without representation and testified at an administrative hearing before ALJ Deborah Foresman. *See* R. 30–80. A vocational expert ("VE") also testified at this hearing. *See* R. 66–80.

ALJ Foresman issued an unfavorable decision on September 16, 2019. *See* R. 13–24. She first found that although Patina had worked some in 2018, she had not engaged in substantial

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

gainful activity since her alleged onset date. R. 15–16. She then found that Patina had "severe" impairments of peripheral neuropathy, white matter disease, vertigo, and loss of central visual acuity in her right eye. R. 16. Patina's fibromyalgia, "history of migraine headaches," COPD, diabetes, and anxiety and depression were all "non-severe" impairments because they did "not more than minimally affect her ability to perform basic work activities." *See* R. 16–17. None of Patina's severe impairments met or equaled any relevant Listing. R. 18 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 2.02, 2.07, 11.14, 11.17).

ALJ Foresman then evaluated Patina's RFC and found that she could perform "sedentary" work with additional limitations. R. 18–19. Specifically, Patina could lift and carry up to ten pounds occasionally and less than ten pounds frequently; could "stand and walk for two hours combined," and "sit for six hours combined[,] of an eight-hour workday"; could occasionally balance, kneel, crouch, crawl, stoop, and climb ramps and stairs; and could never climb ladders, ropes, or scaffolds. *Id.* "Pushing and pulling [were] limited only by her ability to lift and carry," her abilities to "reach, handle, and finger with her upper bilateral extremities [were] unlimited, and she [could] frequently feel with her bilateral upper extremities." R. 19. Finally, she could "perform work not requiring any binocular vision," "requiring up to frequent exposure to noise, and . . . requir[ing] no exposure to vibration and workplace hazards, such as unprotected heights and dangerous machinery." *Id.* Based on this RFC finding, and the VE's testimony, ALJ Foresman determined that Patina was unable to return to her past relevant work, R. 22, but that she could have performed the requirements of certain "sedentary" jobs existing in significant numbers in the national economy, R. 23 (citing R. 74–76). She therefore found Patina "not disabled" from April 25, 2018, through the date of her decision. R. 24. The Appeals Council declined to review that decision, R. 1–3, and this appeal followed.

4

III. Discussion

Patina is representing herself in this case. Accordingly, the Court must "liberally" construe her filings "to allow for the development of a[ny] potentially meritorious claim." *Boag v. MacDougall*, 454 U.S. 364, 365 (1982) (per curiam). Liberally construing Patina's filings, she argues that the ALJ's decision is not supported by substantial evidence and that ALJ Foresman should have included greater functional limitations in the RFC findings. *See generally* Pl.'s Br., ECF No. 15. The question of whether Patina was disabled is for the Commissioner to decide. The fundamental question before the Court today is "whether the ALJ's finding that she [was] *not disabled* is supported by substantial evidence and was reached based on a correct application of the relevant law." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (emphasis added). ALJ Foresman's decision does not meet these minimum standards. She improperly discredited Patina's subjective allegations of pain and other symptoms based solely on their inconsistency with the objective medical evidence, 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."), and on her personal observations, which were contradicted by Patina's undisputed testimony, of the severity and limiting effects of Patina's migraine headaches, *Hines*, 453 F.3d at 566 ("The deference accorded to an ALJ's findings does not mean that we credit even those findings contradicted by undisputed evidence."). Thus, I find that the decision is not supported by substantial evidence and remand is warranted.

A.    *Summary*

    1.    *Relevant Medical Evidence*

5

Patina has been blind in her right eye since age two. *See* R. 58, 427. In February 2018, Patina saw James Isernia, M.D., her primary care provider, for a follow-up visit regarding her hypertension, migraines, and difficulty sleeping. R. 348. Dr. Isernia's notes reflect that Patina was experiencing "some flares of fibromyalgia especially lately," *id.*, "some pre-syncope with dizziness and lightheadedness," *id.*, sleep issues because of pain and insomnia, *id.*, fatigue, R. 348–49, knee pain, R. 349, and bursitis in her hips, *id.* Examination revealed "no actual tenosynovitis but some crepitus and irritation and soreness with active and passive motion," pain in both hips at bursas, and "neuropathy seem[ed] evident in [her] legs and feet." R. 350. Dr. Isernia assessed neuropathy, essential hypertension, type 2 diabetes mellitus, "migraine with aura, not intractable, without status migrainosus,"[4] COPD, and fibromyalgia. *Id.* He increased Patina's neuropathy medication and continued her other treatment for diabetes, migraine, and fibromyalgia. R. 351. In April, just prior to her alleged onset date, Patina again saw Dr. Isernia; she complained of dizziness and lightheadedness, and she reported walking problems and falling. R. 334–40. Examination findings remained generally the same; however, a positive baranay maneuver was also noted. *Id.* Dr. Isernia added "gait apraxia"[5] and vertigo to his assessment. R.

---

[4] "Migraine with aura, not intractable, without status migrainosus – G43.109," R. 350, is the diagnosis for a subtype of migraine headache, preceded or accompanied by disruption in one or more senses (i.e., aura), *see* ICD10Data.com, Diagnosis Code G43.109, www.icd10data.com/ICD10CM/Codes/G00-G99/G40-G47/G43-/G43.109 (last visited Jan. 28, 2022), that typically lasts up to 72 hours and can be treated with medications outside a hospital setting (i.e., is "not intractable" and "without status migrainosus"), The Migraine Institute, "Does Your Headache Last Longer Than 72 Hours?", www.themigraineinstitute.com/status-migrainosus-migraines (last visited Jan. 28, 2022).

[5] "Gait apraxia – R.48.2," R. 336, is the diagnosis for "impaired ambulation not attributed to sensory impairment or motor weakness," Nat'l Ctr. for Biotech. Info., Gait Apraxia, www.ncbi.nlm.nih.gov/mesh (last visited Jan. 28, 2022). "Apraxia is a neurological disorder characterized by the inability to perform learned (familiar) movements on command, even though the command is understood and there is a willingness to perform the movement." Nat'l Org. for Rare Diseases, Rare Disease Database, Apraxia, rarediseases.org/rare-diseases/apraxia (last visited Jan. 28, 2022).

337. He continued Patina on Percocet, Fentanyl patches, Alprazolam, Gabapentin, and her inhaler. R. 338.

Later in April, Patina presented to the Emergency Department at Sovah Health, reporting that she had started feeling dizzy two weeks prior after hitting her head on a chair, and describing the "room spinning and feeling off balance." R. 282. No remarkable examination findings were noted, however, aside from a scratch on her right cornea. R. 283. The attending physician assessed a crushing injury to the head, dizziness and giddiness, and hypokalemia; discharged Patina to home in stable condition; referred her to a neurologist; and ordered her to follow up in a few days for further diagnostic workup. R. 286. Patina also underwent a CT scan of her head that day, which revealed "[n]o acute intracranial abnormality." R. 292.

Patina followed up with Dr. Isernia as instructed. R. 327–33. Dr. Isernia's general notes remained the largely the same as from the previous visit, although he now noted that Patina had experienced balance and other issues for two weeks. R. 328 ("2 weeks of balance issues; lateral vertigo; can say things that are wrong; some mumbling at times and possible slurred speech"). Dr. Isernia's examination findings generally remained the same, but it was also noted that Patina's "plantars [were] downgoing" and that her reflexes were intact. R. 329. Aside from fibromyalgia no longer being included on Patina's problem list, Dr. Isernia's assessment was the same. R. 330. He continued Patina on Percocet, Fentanyl patches, Alprazolam, and her inhaler, but he decreased her Gabapentin dosage. R. 331.

The following week, Patina underwent a brain MRI to assess her gait apraxia, migraine headaches, and vertigo. R. 299. The reviewing radiologist noted "mild white matter disease in the cerebral hemispheres" and "signal abnormality in the pons likely[,] likely chronic ischemia." *Id.* (noting that such findings are "most commonly associated with small vessel ischemia"). He

also opined that "multiple other etiologies including demyelinating disease" should be "a consideration in the appropriate clinical setting." *Id.* Patina followed up with Dr. Isernia in May. R. 320–26. At that time, Dr. Isernia noted that Patina had "problems with vertigo and dizziness and some falls and gait apraxia now." R. 321. He noted that Patina had an MRI of her brain and needed to see neurology to rule out multiple sclerosis ("MS") and pontine stroke as causes of her dizziness and falls. *Id.* Examination findings were generally the same, although Dr. Isernia also noted the existence of a "red reflex" on Patina's neurologic exam. R. 322. He added demyelinating changes in brain and pontine lesion to his assessment. R. 323. Dr. Isernia continued Patina on Gabapentin, Percocet, Fentanyl patches, Alprazolam, and her inhaler. R. 324–25. He also instructed her to use a cane for her gait apraxia. R. 324.

Patina visited neurologist Francis Walsh, M.D., in August 2018. R. 414–16. She complained of dizziness and feeling off balance since her fall in April, and she said her symptoms had "not improved." R. 414. Her dizziness and balance issues were worse in the mornings, were "ongoing all day," and sometimes occurred when sitting. *Id.* Further, Patina was unable to drive because of her dizziness, and she had some nausea and had lost eighty pounds in the last year. *Id.* Dr. Walsh noted that Patina was on 180 morphine milligram equivalents ("MME"), which had not been decreased since her significant weight loss. *Id.* Patina also had headaches an average of three to four times a week, *id.*, and her review of systems was positive for anxiety and depression, R. 415. On exam, Patina displayed 5/5 strength in her upper extremities, 4+/5 strength in her lower extremities, reduced sensation to vibration in her distal extremities, a wobbly gait, and normal mood and affect, and she used a cane to walk. R. 415–16. Dr. Walsh assessed snoring, headache, fibromyalgia, falls, vertigo, dizziness, impaired gait and mobility, mild episode of recurrent major depressive disorder, anxiety, mild chronic amnesia,

and moderate chronic nicotine use disorder. R. 416. Dr. Walsh noted that Patina's dizziness and

balance issues were "with no neurological finding," but that she did "have [white matter disease]

which can cause some dizziness and off balance and also cogn[i]tive issues." *Id.* He did not

suspect MS as a possible cause for Patina's symptoms. *Id.* Dr. Walsh "fe[lt] that [Patina's] high

doses of [] medication can cause some issues with not just cognition but also some balance and

dizziness issues," but Patina declined his suggestion to decrease her dosage, stating she took the

medications for her fibromyalgia. *Id.* He did "not feel [he had] much to offer [Patina] at th[at]

time," and he instructed her to call or return if her symptoms persisted or worsened and to follow

up in three months. *Id.*

Later in June, Patina saw Dr. Isernia again, complaining of vertigo and fatigue. R. 313–

19. In Patina's review of systems, she reported "[g]ood health lately; [and] some vertigo lately,

but better." R. 316. Dr. Isernia's exam findings, R. 316–17, and assessment, R. 317, were the

same as at her previous visit. In August, Patina reported to Dr. Isernia that her vertigo was "much

better," although in the past three weeks she had fallen going down the stairs and getting out of

the bathtub. R. 305. Dr. Isernia added to his notes that Patina "still need[ed] [an] evaluation for

demyelinating disease." R. 306. Dr. Isernia's exam findings generally remained the same, but he

also recorded "some gait apraxia" and "multiple falls" on Patina's neurologic exam. R. 309. His

assessment was unchanged. *Id.* Dr. Isernia continued Patina on Percocet, Fentanyl patches,

Aprazolam, Gabapentin, and her inhaler. R. 311. He ordered her to follow up in three months. R.

312.

In November, Patina again complained to Dr. Walsh of dizziness and problems balancing

since April, as well as headaches and nausea. R. 410. At that time, she "ha[d] cut down on some

of [her] meds," and she said that she had "not been using the fentanyl patch for about 1 month

9

now." *Id.* Patina's review of systems, R. 411, and Dr. Walsh's exam findings, R. 411–12, were unchanged from the prior visit. His assessment no longer included snoring, but hypoxia and COPD were added. R. 412. He ordered Patina to undergo an overnight oximity, R. 412, to call or return if her symptoms worsened or persisted, R. 413, and to follow up in two months, *id.*

Later that month, Patina visited with Dr. Isernia for a follow up regarding her gait issues, headaches, and memory difficulties. R. 394–401. Dr. Isernia's notes reflect that Patina had been experiencing increased subjective neuropathy at that time. *See* R. 395 ("more neuropathy lately"). Paresthesias and dysesthesias were observed on her neurologic exam, but otherwise exam findings were unchanged from her previous visit. R. 398–99. Aside from COPD and pontine lesion no longer appearing, Dr. Isernia's assessment was also unchanged. R. 399.

The next day Patina saw Dr. Walsh to potentially rule out MS as a cause of her symptoms. R. 407–09. At that time, she was "sleeping fairly well," her memory and thinking were stable, headaches were rare, and she "ha[d] [a] mild problem with balance and [was] not driving." R. 407. Dr. Walsh noted that she used a cane but had not had any recent falls. *Id.* ("No falls but uses cane."). Patina's review of systems was positive for fatigue and off balance. *Id.* On exam, she displayed normal gait, was able to stand without difficulty, and her sensation was intact to vibration distally, but she had "slightly reduced temp sensation in [her] feet." R. 408. Dr. Walsh assessed common migraine, dizziness, and fibromyalgia; noted that Patina had "a normal neurological exam and her MRI show[ed] minimal white matter changes, typical of migraine, unlikely to be MS;" and said he would reevaluate in four months. R. 409.

In March 2019, Patina saw Gilbert Vance, Ph.D., for a consultative psychological evaluation. R. 418–21. Dr. Vance noted that Patina use[d] a cane for balance and no involuntary movements were observed" during the evaluation. R. 418. He also noted Patina's reported

twenty-year history of depression and anxiety, a long history of chronic headaches, and her

anxiety was "chronic" and had "worsened since the onset of her [physical] problems in 2018." R.

419 ("[S]he had to leave her job [in April 2018] due to sudden onset of vertigo, gait apraxia, and

other problems."). She could "complete activities of daily living without assistance, although it

[took] her longer than it used to." R. 419. She was "able to drive and cook on a minimal basis,"

her social functioning was limited to her family, and she "struggle[d] to complete tasks in a

timely and appropriate manner due to her physical limitations." *Id.* (noting Patina's report that

she drove only when "absolutely necessary," and that her son drove her to the evaluation). Patina

was taking Cymbalta, which she said was for her fibromyalgia, Xanax for anxiety, and Percocet

for chronic pain. *Id.* On exam, her thought processes and content were within normal limits, her

"affect was appropriate to the testing situation," her judgment was intact, and she was pleasant

and cooperative. *Id.* Patina scored two points below "normal limits" on the Montreal Cognitive

Assessment, exhibiting weaknesses in attention and delayed recall. R. 419–20 ("The claimant

scored 24 out of 30, a score of 26 or higher is within normal limits. . . In the domain of attention,

. . . she could not correctly repeat three digits backwards. . . . On a delayed recall task, she was

able to freely recall two of the five words read to her previously in the immediate memory

task."). She described her mood as "numb," which she said was "unusual and that despite her

history of anxiety and depression, she had a full range of emotions until 2018 and the onset of

her severe physical problems." *Id.* Dr. Vance opined that Patina met the criteria for an

Unspecified Anxiety Disorder, noting her reports of "subthreshold panic disorder symptoms with

daily symptoms of chills or hot flushes, fear of losing control, and dizziness or lightheadedness."

R. 420 ("The claimant's statements and portrayal of symptoms were highly consistent with

collateral information received by this examiner and the claimant's own statements throughout

the interview and examination process were judged to be consistent and credible.") He

determined Patina's Major Depressive Disorder was in remission. *Id.* His prognosis was

"uncertain," but he noted that her anxiety remained present. *Id.*

Dr. Vance opined that, if Patina were to work, she would be limited to simple, repetitive

tasks and would be able to maintain regular workplace attendance, but that she "may struggle to

perform work activities on a consistent basis." *Id.* He found she would not need special or

additional supervision; would likely struggle to complete a normal workday or workweek

without interruptions; would be able to accept instructions from supervisors and interact

effectively with coworkers and the public; and "may struggle to handle the stresses encountered

in competitive work." *Id.*

In April, Patina complained to Erin Woods, O.D., that her vision was blurry and that she

had been experiencing daily headaches. R. 428. She reported "last April having a dizzy spell that

lasted for about 3 months," and that her "vision seem[ed] to be different" after that. *Id.* (also

reporting light sensitivity, burning, and new blurred near and distance vision). At that time, she

was taking Cymbalta, Xanax, and Percocet. *Id.* She was noted to have a normal mood and affect

and to be oriented to person, place, and time. R. 429. The vision in her left eye was normal. She

had light perception temporally, but no vision, in her right eye. *See* R. 428–30.

Later in April, Patina saw Brian Dena, D.O., for a consultative physical evaluation. R.

423–27. She "report[ed] having difficulty with intermittent vertigo over the past year and

report[ed] waxes and wanes that occur[ed] daily." R. 423. She had "been using a cane to prevent

falls, which she ha[d] not had." *Id.* She also reported hand numbness, forgetfulness, clouded

thinking, and blurry vision "that changes from day to day." *Id.* She "ha[d] not taken any

medications for the dizziness," and she had joint pains she attributed to her fibromyalgia and

12

treated with Percocet. *Id.* Dr. Dena noted she was able to independently perform "basic"

activities of daily living, including bathing, dressing, eating, and toileting. *Id.* Patina's review of

systems was positive for blurry vision, loss of vision, cough, shortness of breath, nausea,

vomiting, urinary frequency and urgency, back and joint pain, tingling, dizziness, and anxiety. R.

424. On exam, Patina could rise from her chair independently, she "navigate[d] the exam room

without difficulty or shortness of breath," and she had normal mood and affect. R. 425. Her gait

had a normal base of support, a short stride, and was non-antalgic, but Patina was unable to walk

on her heels or toes, and she was unable to tandem gait. *Id.* She did not use an assistive device to

walk. *Id.* Dr. Dena classified Patina's fibromyalgia as chronic and stable, R. 427, noting

"[m]ultiple areas of tenderness without gross abnormality," R. 426. In diagnosing vertigo, Dr.

Dena observed that Patina "ambulates with a cane and [was] unable to walk on [her] heels/toes."

R. 427.

      Dr. Dena opined as to Patina's functional abilities based on that day's physical exam. R.

427. He found that she could stand/walk for about two hours and sit for about six hours in an

eight-hour workday; she could lift/carry twenty pounds occasionally and ten pounds frequently;

she could reach, handle, feel, grasp, and finger "continuously," which he defined as "over 2/3" of

the day; and she could bend, stoop, crouch, and squat "occasionally," or "up to 1/3 of [the] time."

*Id.* Dr. Dena also opined that Patina did "not need an assistive device to ambulate" and had no

visual or communication limitations. *Id. But see* R. 426 ("Overall claimant would be limited by

reported right eye vision loss, episodes of vertigo, and intermittent joint pains.").

      In May, Patina had a physical with Dr. Isernia. R. 432–37. Dr. Isernia's general notes

remained the same, and he noted that Patina was taking Xanax, Percocet, Duloxetine, and Super

B Complex at that time. R. 432–33. Her review of systems continued to be positive for "[g]ood

health lately; some vertigo lately but better." R. 434. Dr. Isernia's exam findings and assessment were unchanged from the prior visit. R. 435. He continued Patina on her medications and ordered her to follow up in four months. R. 436–37.

In June, Patina saw Victor Owusu-Yaw, M.D., of Danville Neurology to be evaluated for MS. R. 438–41. On exam, he found no evidence of impaired concentration or memory disturbance, but Patina was "unable to walk on [her] heel[s] and toe[s] and perform tandem walking," and she "require[d] [a] cane for ambulation." R. 439. Her reflexes and sensation were normal, and her toes were down-going bilaterally. *Id.* Dr. Owusu-Yaw assessed "migraine without aura, not intractable, without status migrainosus," essential hypertension, unspecified abnormalities of gait and mobility, dizziness and giddiness, generalized anxiety disorder, other chronic pain, and unspecified polyneuropathy. R. 440.

2.    *Patina's Statements*

In October 2018, Patina submitted a Function Report to DDS. R. 209–16. She would care for her young son as much as possible, *see* R. 419 ("The claimant lives with her husband and 10-year-old son."), and wash his clothes once a week, but required assistance from her son and husband for many household tasks, like paying bills and yardwork. R. 210. Her conditions caused trouble sleeping and her dizziness made shaving difficult and caused her to cut herself. *Id.* Patina could cook daily, but she mostly prepared simple meals like frozen dinners and sandwiches. R. 211. She tried to clean and vacuum, but usually did so only once per week and would sit down as needed. *Id.* She could drive, but she limited her driving when possible because of her dizziness. R. 212. Patina also grocery shopped in stores about once per week for an hour. *Id.* Her only hobby was watching television, and she enjoyed talking with her husband, children, and grandchildren but did not go out with friends. R. 213–14. Her dizziness caused her to fall

and impacted her abilities to squat, bend, stand, walk, kneel, and climb stairs. R. 214. She used a

cane or a walker, which had been prescribed by a physician, when outside or shopping. R. 215.

In August 2019, Patina testified at a hearing before ALJ Foresman. *See* R. 30–66. She

testified that she is unable to walk without some form of support, such as a cane, walker, or the

walls in her home. R. 39, 42–43. She experienced frequent falls, with her most recent being two

days before the hearing. R. 43–44. When asked how she became disabled, she described having

been "constantly dizzy for like three months" around her alleged onset date, R. 44, and she said

she continued to experience dizziness that "comes and goes," *id.*, particularly when standing,

walking, and cooking, R. 45. She was unsure how much she could lift but said she "probably"

could have lifted two gallons of milk, although it would be harder some days than others. R. 53.

Without her cane she was unable to stand for thirty minutes, but she "probably" could have stood

for thirty minutes with it, R. 53–54, and she could walk a maximum of twenty minutes at a time,

R. 54. Patina described suffering from two kinds of headaches, which she and ALJ Foresman

referred to as "migraine" headaches and "regular non-migraine headaches," respectively. R. 55;

*see also* R. 54. They discussed both types at the hearing, and Patina noted that she had a

moderate "regular" headache during their exchange:

> Q:    . . . Now, you mentioned headaches. How often do you have those?
> A:    Daily.
> Q:    And how long does one of 'em last?
> A:    They -- last until I take something . . . so they could last anywhere from 30
>        minutes to all day. And then I also --
> Q:    So what -- go ahead.
> A:    -- also have migraines.
> ***
> Q:    [W]hen you have one of these migraines or headaches, how does it affect
>        you? . . . . [W]ould somebody be able to look at you and say, something's
>        goin' on with that lady?
> A:    With my migraines? Yes, ma'am. Most definitely. Because I'll be cryin'
>        and throwin' up --

15

Q:    'Kay. How often do you have a migraine?

A:    I guess maybe -- a migraine, maybe once every two weeks.

Q:    Okay. Now with the regular non-migraine headaches, anyway [sic] somebody would know you're in pain or havin' a headache when you're havin' one of those?

A:    I really couldn't tell ya. . . cuz like I said, they're pretty much constant. . . . [L]ike I've got one now. And --

Q:    Okay.

A:    It's just like any time I try to concentrate really hard, it just makes my head throb.

Q:    Okay. Is your head throbbin' right now?

A:    Yes, ma'am.

* * *

Q:    Okay. All right. On a scale of 1 to 10 with 1 being, you know, I've got a little twinge . . . to 10 being I wish I had taken . . . myself to the emergency room yesterday; where's your pain right now on that scale?

A:    A 5 or 6. . . . I've been to the emergency room . . . . for one before, and I won't go back.

Q:    Okay. Does your pain ever get above a 5 or a 6 on that scale?

A:    Yes, sometimes.

Q:    How often would you say you might get above a 6 outta 10?

A:    Maybe two days out the week.

R. 54–57. Both kinds of headaches impaired Patina's memory and concentration. *See* R. 56, 60–61, 63–64. She limited her driving because it caused head pain. R. 58. She tried to do some household work but paid her son to do most basic chores. R. 62–63.

B.    *The ALJ's Decision*

ALJ Foresman discussed some of this evidence in her decision. *See generally* R. 16–22. At step two, she found that Patina's "peripheral neuropathy, white matter disease, vertigo, and loss of central visual acuity in her right eye" were "severe" medically determinable impairments because they "significantly limit [her] ability to perform basic work activities," R. 16, which include capacities for walking, standing, lifting, carrying, seeing, and remembering simple instructions, 20 C.F.R. § 404.1522(b)(1)–(3). She also found that Patina's allegedly debilitating migraine headaches were "non-severe" impairments because they did "not more than minimally

16

affect her ability to perform basic work activities." R. 16. More specifically, ALJ Foresman found that Patina "testified that she had a migraine headache at the time of the hearing" and that she "experiences nausea when she has one." *Id.* ALJ Foresman "observed that [Patina] did not seem to have difficulty following the hearing proceedings or answering questions appropriately and clearly, despite having a migraine." *Id.* "Objective examinations were generally unremarkable, with intact cranial nerves, normal reflexes, and no focal deficits," and her "migraines are not intractable." *Id.* (citing R. 440).

In determining Patina's RFC, ALJ Foresman summarized Patina's subjective statements regarding her symptoms and limitations, R. 19, summarized the medical evidence, R. 20, and summarized the medical opinion evidence of record, R. 21–22. As relevant here, she found that Patina's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," R. 19, but that her "statements concerning the intensity, persistence, and limiting effects of th[o]se symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained" elsewhere in her decision. R. 20.

ALJ Foresman detailed Patina's testimony that she had trouble focusing and seeing when reading, used a cane or the walls in her home for balance while walking, got dizzy whenever she stood up, experienced migraines causing nausea, and had eye problems causing coordination issues. R. 19. ALJ Foresman also noted that Patina said she could "do some household chores, such as dishes and laundry, but she need[ed] to take breaks," her son helped clean the bathroom and kitchen, she had trouble comprehending television shows, she no longer went out to eat, she could take care of her personal hygiene, and she grocery shopped every two or three days "using the cart to stabilize herself." *Id.* Explaining her reasoning for discrediting these statements, ALJ Foresman observed that "[v]arious factors are inconsistent with limitations to the degree

17

alleged," but her focus was "[p]rimarily" that "objective findings ha[d] been minimal." R. 20.

She noted that although Patina "testified that she becomes dizzy every time she stands up,

objective findings are minimal." *Id.* And that although Patina "displayed some gait ataxia and

had difficulty with tandem walking, . . . she was able to walk independently." *Id.* Next, ALJ

Foresman discredited Patina's testimony that she has "frequent migraine headaches," noting a

lack of "objective observations of a migraine episode or any migraine journal logs," and that

although Patina "testified that she had a migraine during the hearing, the [ALJ] observed that she

appeared able to speak normally, with a normal tone of voice, even chuckling at times, and did

not seem to be in pain." *Id.* ALJ Foresman concluded that Patina's "impairments impose some

limitations, but [that] the degree of limitation that [was] consistent with the record ha[d] been

accounted for by the restrictions" in Patina's RFC. *Id.*

C.    *Analysis*

Patina's arguments on appeal primarily challenge the ALJ's RFC determination and the

failure to account for the limitations caused by her migraine headaches, dizziness, and

neuropathic pain. A claimant's RFC is her "maximum remaining ability to do sustained work

activities in an ordinary work setting" for eight hours a day, five days a week despite his medical

impairments and symptoms.[6] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis

omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case

record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect

specific, credibly established "restrictions caused by medical impairments and their related

symptoms" that affect the claimant's "capacity to do work-related physical and mental

---

[6] "Symptoms" are the claimant's own description of his or her medical impairment. 20 C.F.R. §
404.928(a).

activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40
(4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25,
2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016).

The regulations set out a two-step process for evaluating a claimant's alleged symptoms.
*Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical
evidence showing a condition that could reasonably produce the alleged symptoms," *Lewis*, 858
F.3d at 866, "in the amount and degree[] alleged by the claimant." *Craig v. Chater*, 76 F.3d 585,
594 (4th Cir. 1996). Step One is a "threshold" inquiry, at which the "'intensity, persistence, or
functionally limiting effects' of the claimant's asserted pain" are not considered. *Id.* Assuming
the claimant clears the first step of the *Craig* analysis, the ALJ moves on to Step Two. There,
"the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's
symptoms to determine the extent to which they limit his ability," *Lewis*, 858 F.3d at 866, to
work on a regular and continuing basis, *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015);
*Hines*, 453 F.3d at 565; *see also* SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016). "The
second determination requires the ALJ to assess the credibility of [subjective] statements about
symptoms and their functional effects," *Lewis*, 858 F.3d at 866, after considering all the relevant
evidence in the record, 20 C.F.R. § 404.1529(c). "At this step, objective evidence is *not* required
to find the claimant disabled." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir.
2020) (citing SSR 16-3p, 2016 WL 1119029, at *4–5). Rather, a claimant having met his or her
"threshold obligation of showing by objective medical evidence a condition reasonably likely to
cause the pain" alleged is then "entitled to rely exclusively on subjective evidence to prove the
second part of the test, *i.e.*, that [t]his pain is so continuous and/or so severe that it prevents him
[or her] from working a full eight hour day." *Hines*, 453 F.3d at 565 (footnotes omitted).

The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July 2, 1996)). But because "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," an ALJ "may 'not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate' them." *Arakas*, 983 F.3d at 95 (quoting SSR 16-3p, 2016 WL 1119029, at *4–5); *see* 20 C.F.R. § 404.1529(c)(2). A reviewing court will uphold the ALJ's credibility determination if her articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011 (4th Cir. 1997)).

Even under this deferential standard, I cannot find that ALJ Foresman's credibility determination is supported by substantial evidence. ALJ Foresman satisfied step one by finding that Patina's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but she erred at step two by discrediting Patina's subjective allegations regarding her dizziness and gait impairments because she relied solely on her assessment of the objective medical evidence.

"[O]nce objective medical evidence establishes a condition which could reasonably be expected to cause pain of the severity a claimant alleges, those allegations may not be discredited because they are not confirmed by objective evidence of the severity of the pain." *Craig*, 76 F.3d at 595. Thus, an ALJ may not discount a claimant's report of symptoms and limitations merely because the objective medical evidence does not align perfectly with the reported symptoms. *Lewis*, 858 F.3d at 866 (citing 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2)) ("[S]ubjective

20

evidence of pain intensity cannot be discounted solely based on objective medical findings."). Rather, there must be some additional consideration supporting such a finding not based on the objective medical evidence. *Id.* Further, "the [ALJ] cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony." *Johnson*, 449 F.3d at 806. Thus, ALJ Foresman could not rely on the objective medical evidence alone to find that Patina's symptoms were not as severe as she claimed. *Lewis*, 858 F.3d at 866.

With respect to Patina's allegations of severe dizziness and gait limitations, ALJ Foresman discredited that testimony "primarily" because "objective findings have been minimal," and although Patina "displayed some gait ataxia [sic] and had difficulty with tandem walking,"[7] she "was able to walk independently" and her "brain MRI findings show mild white matter disease." R. 20. The ALJ's analysis relied exclusively on perceived inconsistencies between the objective medical evidence and Patina's alleged symptoms. *See* 20 C.F.R. § 404.1529(c)(2) ("Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption."). The regulations, however, require ALJ's to analyze a broader range of factors when assessing the credibility of a claimant's symptoms. *See* 20 C.F.R. § 404.1529(c)(3) (listing "what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms affect your pattern of daily living" as examples of non-objective considerations when determining the severity of a claimant's alleged symptoms). Despite this regulatory requirement, the ALJ's analysis did not include a discussion of any relevant factor besides the objective medical evidence.

---

[7] Patina's medical records document "gait apraxia," *see, e.g.*, R. 299, 321, 324, not gait "ataxia," R. 20.

Moreover, the ALJ's assertion that Patina "was able to walk independently" despite having issues with tandem walking overlooks key contradictory evidence. For instance, Dr. Isernia began instructing Patina to use a cane for her gait apraxia in May 2018. R. 324. Additionally, at her August 2018 appointment with Dr. Walsh, a physical examination revealed that Patina had a wobbly gait and used a cane to walk. R. 416; *see also* R. 412 (same exam findings November 2018). Just a month later, Patina reported to Dr. Isernia that she had fallen going down the stairs and while getting out of the bathtub, both in the three weeks prior. R. 305. Further, during her psychological consultation with Dr. Vance, Patina "was observed to use a cane for balance." R. 418. And, in June 2019, Dr. Owusu-Yaw's examination findings revealed that Patina was "unable to walk on [her] heel[s] and toe[s] and perform tandem walking," and that she "require[d] [a] cane for ambulation." R. 439.

Nonetheless, some evidence does support the ALJ's finding that Patina could walk independently. R. 407 (November 2018 Dr. Walsh exam showing normal gait, able to stand without difficulty); R. 425 (Dr. Dena exam showing Patina could rise from her chair without difficulty, could navigate the exam room without difficulty, and had a non-antalgic gait with normal base of support). Primarily, Dr. Dena's opinion that Patina did "not need an assistive device to ambulate" lends itself to such a finding. R. 427. Although Dr. Dena's examination revealed that Patina did not need an assistive device to ambulate, it also showed that she was unable to walk on her heels and toes, and that she was unable to tandem gait. R. 425. Further, when diagnosing vertigo, Dr. Dena noted that Patina "ambulate[d] with a cane and [was] unable to walk on [her] heel/toes." R. 426.

Yet, despite significant contradictory evidence within the record, ALJ Foresman never explained how she weighed the competing evidence or how she concluded either that Patina

could "walk independently" or that Patina could stand and walk, without an assistive device, for two hours during an eight-hour day. Indeed, many of the physicians' abnormal findings went wholly unmentioned. An "ALJ must both identify evidence that supports [her] conclusion and build an accurate and logical bridge from that evidence to [her] conclusion." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *see also Hancock v. Barnhart*, 206 F. Supp. 2d 757, 764 (W.D. Va. 2002) ("[I]f the ALJ appears, without stating a reason, to have credited some probative evidence over other evidence or to have ignored evidence altogether, a remand or reversal may be necessary."). Here, ALJ Foresman did not consider pertinent evidence, or did not explain how and why she weighed it in the manner she did. As such her decision cannot withstand scrutiny. *See Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) ("The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence.").

Furthermore, the ALJ's analysis of Patina's migraine headaches and any limitations caused by them does not comply with the regulations. The ALJ found that Patina's migraine headaches were a non-severe impairment.[8] R. 16. She also questioned the severity of Patina's symptoms and limitations that could be attributed to migraines. R. 20. The ALJ cited a lack of objective evidence of migraines, and she relied on her own observations at the administrative hearing that Patina was not experiencing limitations from a migraine. R. 16, 20. Both reasons were flawed.

First, the ALJ found that objective evidence consisting of intact cranial nerves, normal reflexes, and no focal deficits and the fact that Patina's migraines were "not intractable" showed that they did not cause more than minimal limitations. R. 16. The ALJ did not explain why those

findings were more significant than other contrary findings that documented the existence of

migraines, such as consistent diagnoses, complaints, treatment, and, as Dr. Walsh found, a

"neurological exam and her MRI show[ed] minimal white matter changes, typical of migraine."

R. 408. Moreover, Patina was not required to keep a "migraine journal" or produce "objective"

proof that she experienced migraine headaches during doctors' appointments to corroborate her

sworn testimony. R. 16; *cf. Lisa S. v. Berryhill*, No. 4:17cv77, 2019 WL 1302640, at *8 (W.D.

Va. Feb. 16, 2019) (rejecting ALJ's rationale that claimant's "'allegedly limited daily activities

cannot be objectively verified with any reasonable degree of certainty'" because the statement

was ambiguous and "[m]ore importantly," claimant "was not required to 'objectively verify' the

nature or scope of her daily activities" that she described at hearing). Considering this objective

medical evidence, Patina's regular treatment for migraines, and her consistent reports of

symptoms, the ALJ's cursory analysis does not stand up. *See Hancock*, 206 F. Supp. 2d at 764.

Second, the ALJ's reliance on Patina's hearing testimony and the ALJ's own

observations was clearly erroneous. The ALJ found that Patina "testified that she had a migraine

headache at the time of the hearing." R. 16; *accord* R. 20. Patina testified, however, that she had

migraines "once every two weeks." R. 55. Patina did not indicate that she was then experiencing

a migraine. Responding to the ALJ's question about "regular non-migraine headaches," Patina

said, "they're pretty much constant . . .like I've got one now." R. 55–56. Thus, the transcript

clearly shows that Patina testified she was experiencing a "regular non-migraine headache" at the

hearing, not, as the ALJ found, a migraine headache. *See Hines*, 453 F.3d at 566 ("The deference

accorded an ALJ's findings of fact does not mean that we credit even those findings contradicted

by undisputed evidence."). Patina also said that someone "definitely" would be able to tell if she

were having a migraine because she would be vomiting and crying from severe pain, but she did

not know if someone could identify a "regular" headache because they mostly caused moderate-to-severe "throbbing" pain in her head. R. 55–56. Thus, the ALJ's determination as to Patina's migraine headaches is not supported by substantial evidence. *See Hines*, 453 F.3d at 565 (substantial evidence did not support ALJ's finding that claimant's testimony describing chronic fatigue, memory problems, and severe leg pain was "inconsistent" with testimony describing limited and sporadic daily activities "because the record, when read as a whole, reveals no inconsistency between the two"); *Lilly v. Astrue*, No. 5:08cv115, 2009 WL 4015341, at *4 (W.D. Va. Nov. 18, 2009) (finding reversible error where an ALJ "discount[ed] a widely recognized and objective functional testing protocol simply because the plaintiff did not appear disabled at the administrative hearing").

I take no position on whether Patina is entitled to disability benefits for the relevant period. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record, explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination, and, assuming Patina cannot prove disability based on the medical evidence alone, provide a logical link between the evidence the Commissioner found credible and the RFC determination.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 16, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding district judge.

The Clerk shall send certified copies of this Report and Recommendation to the pro se Plaintiff and counsel for the Commissioner.

ENTER: January 31, 2022

Joel C. Hoppe
U.S. Magistrate Judge